Filed 5/30/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| In re | B320098 |
|---|---|
| LESLIE VAN HOUTEN | (Los Angeles County Super. Ct. No. A253156) |
| on Habeas Corpus. | |

ORIGINAL PROCEEDING; petition for writ of habeas corpus, Ronald S. Coen, Judge. Petition granted.

Nancy L. Tetreault and Rich Pfeiffer for Petitioner.

Rob Bonta, Attorney General, Phillip J. Lindsay, Assistant Attorney General, Julie A. Malone, Jennifer L. Heinisch, and Jennifer O. Cano, Deputy Attorneys General, for Respondent.

_____

Leslie Van Houten petitions for a writ of habeas corpus challenging Governor Gavin Newsom's reversal of her 2020 grant of parole. Van Houten is serving concurrent sentences of seven years to life for the 1969 murders of Rosemary and Leno La Bianca, which she committed with other members of a cult led by Charles Manson. This is the fourth time a governor has reversed Van Houten's parole.[1]

In his reversal decision, the Governor found inadequate Van Houten's explanation of how she fell under Manson's influence and engaged in her life crimes. The Governor further found that recent statements Van Houten made were inconsistent with statements she made at the time of the killings, indicating "gaps in Ms. Van Houten's insight or candor, or both." Finally, although Van Houten's most recent criminal risk assessment found her at low risk for violent recidivism, the Governor found several "historical factors" identified in that assessment "remain salient" to Van Houten's current dangerousness, such as her prior acts of violence, traumatic experiences, and substance abuse.

We review the Governor's decision under the highly deferential "some evidence" standard, in which even a modicum of evidence is sufficient to uphold the reversal. Even so, we hold on this record, there is no evidence to support the Governor's conclusions.

Van Houten provided extensive explanation as to the causative factors leading to her involvement with Manson and commission of the murders, and the record does not support a

---

[1] Van Houten has since been granted parole a fifth time, and the Governor reversed that grant in 2022.

conclusion that there are hidden factors for which Van Houten has failed to account. The Governor's refusal to accept Van Houten's explanation amounts to unsupported intuition. The Governor's finding of inconsistencies between Van Houten's statements now and at the time of the murders fails to account for the decades of therapy, self-help programming, and reflection Van Houten has undergone in the past 50 years. The historical factors identified in the criminal risk assessment are the sort of immutable circumstances our Supreme Court has held cannot support a finding of current dangerousness when there is extensive evidence of rehabilitation and other strong indicators of parole suitability, all of which Van Houten has demonstrated.

Accordingly, we grant Van Houten's petition.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1.    *Van Houten's background and commitment offenses*

We derive this summary from *In re Van Houten* (2004) 116 Cal.App.4th 339, 343.[2] We provide further detail, *post*, in our summary of the record from Van Houten's 2020 parole proceedings.

Van Houten grew up in Southern California. Her parents divorced when she was 14. She lived with her mother until she graduated high school, then lived with her father and stepmother for a year while she attended Sawyer College and earned a legal

---

[2] *In re Van Houten* addressed the trial court's grant of Van Houten's petition for a writ of habeas corpus after she was denied parole in 2000. (*Supra*, 116 Cal.App.4th at pp. 342, 347.) The Fourth District Court of Appeal reversed. (*Id.* at p. 367.)

3

secretary certificate.  (*In re Van Houten*, *supra*, 116 Cal.App.4th at p. 343.)

Van Houten began using drugs at age 14, including marijuana, methedrine, mescaline, benzedrine, and LSD.[3]  At 17 she became pregnant and had an abortion.[4]  (*In re Van Houten*, *supra*, 116 Cal.App.4th at p. 343.)

In 1968, after receiving her legal secretary certificate, Van Houten traveled up and down the California coast for several months.  She heard about a commune at the Spahn Ranch in Chatsworth, California established by Charles Manson and began living there.  (*In re Van Houten*, *supra*, 116 Cal.App.4th at p. 343.)

Although at first Van Houten found the commune "idyllic," there soon emerged a "sinister side" of what was called the Manson "Family."  (*In re Van Houten*, *supra*, 116 Cal.App.4th at p. 344.)  "Manson dominated and manipulated the members of the Family.  [Citation.]  Within the context of isolation, dependence, fear, drugs, sex, and indoctrination of the Family experience, the members became convinced of Manson's peculiar apocalyptic fantasies and goals."  (*Ibid.*)  Manson believed in "an impending bloody, civilization-ending, worldwide race war between Blacks and Whites," in which "the Blacks would succeed" but "the Family would emerge . . . to take control and restore order.  Manson came to believe that he would have to

---

[3]  According to her 2018 comprehensive risk assessment, Van Houten stated she started using LSD at age 15.

[4]  *In re Van Houten* stated Van Houten "either miscarried or had an abortion."  (*Supra*, 116 Cal.App.4th at p. 343.)  The record from Van Houten's 2020 parole hearing makes clear she had an abortion.

4

precipitate the race war by murdering Whites . . . in such a way that Blacks would be blamed for the murders." (*Id.* at p. 344, fn. 1.)

During the evening of August 8 or the early morning of August 9, 1969, members of the Manson Family, including Patricia Krenwinkel and Charles Tex Watson, entered the residence of Sharon Tate Polanski and murdered Polanski, Voitcek Frykowski, Abigail Folger, Jay Sebring, and Steven Parent. (*In re Van Houten, supra,* 116 Cal.App.4th at p. 344.) Van Houten was not present and did not participate in these murders, although when she heard about them the next day, she "felt 'left out' and wanted to be included next time." (*Id.* at p. 345.)

On August 9 or 10, 1969, Manson, Van Houten, and other members of the Family, including Watson and Krenwinkel, drove around Los Angeles "following Manson's apparently random directions for about four hours selecting and discarding possible victims." They stopped near the home of Leno and Rosemary La Bianca. Manson and Watson went inside and surprised and tied up the La Biancas. Manson then returned to the car and told Van Houten and Krenwinkel "to go into the house and do what Watson told them to." (*In re Van Houten, supra,* 116 Cal.App.4th at p. 345.)

Inside the home, Watson told Van Houten and Krenwinkel to take Mrs. La Bianca into the bedroom and kill her. Van Houten placed a pillowcase over Mrs. La Bianca's head and secured it with a lamp cord wrapped around Mrs. La Bianca's neck. Mrs. La Bianca heard Watson stabbing her husband and struggled with Van Houten, who wrestled her onto the bed and pinned her down. Krenwinkel stabbed Mrs. La Bianca with a

5

knife she had taken from the kitchen.  (*In re Van Houten*, *supra*, 116 Cal.App.4th at p. 346.)

Van Houten called for Watson, who came into the bedroom and stabbed Mrs. La Bianca eight times with a bayonet.  Watson then handed Van Houten a knife "and told her to do something." Van Houten suspected Mrs. La Bianca was dead at this point but " 'didn't know for sure.' "  Van Houten stabbed Mrs. La Bianca between 14 and 16 times.  (*In re Van Houten*, *supra*, 116 Cal.App.4th at p. 346.)

After the stabbing, Van Houten "wiped away the perpetrators' fingerprints while Krenwinkel wrote in blood on various surfaces in the residence."  Thereafter, Van Houten hid for over two months at a "remote location" until she was arrested on November 25, 1969.  (*In re Van Houten*, *supra*, 116 Cal.App.4th at p. 346.)

A jury convicted Van Houten in 1971 of two counts of first degree murder and one count of conspiracy to commit murder. The jury imposed a death sentence.  The Court of Appeal reversed the judgment because Van Houten's attorney had disappeared during the trial.  Van Houten was retried and the jury deadlocked.  In a third trial, a jury again convicted Van Houten of two counts of first degree murder and one count of conspiracy to commit first degree murder.  The trial court imposed concurrent life sentences with the possibility of parole. (*In re Van Houten*, *supra*, 116 Cal.App.4th at p. 347.)

### 2.    *Prior parole reversals*

The Board of Parole Hearings (the Board) found Van Houten suitable for parole in 2016, 2017, and 2019. Governor Brown reversed the first two grants, and Governor

6

Newsom reversed the third. Van Houten unsuccessfully challenged the Governors' reversals in court.

### 3.    *2018 comprehensive risk assessment*

A forensic psychologist prepared a comprehensive risk assessment (CRA) of Van Houten in the fall of 2018, following an interview with Van Houten and a review of her confidential file. Because the Board relied on the 2018 CRA in granting Van Houten parole in 2020, and the Governor also referred to it in his reversal decision, we summarize it in detail. Our summary does not correspond to the order in which the CRA presented the information.

### a.    Child, adolescent, and adult development

The CRA described the evaluator's interview with Van Houten about her life leading up to her involvement with Manson and the commitment offenses. Van Houten stated her parents' divorce when she was 14 "was challenging for her. She felt anger towards her mother and also felt a sense of abandonment. She began to associate with kids from other single-mother homes, something that was not common at the time."

Van Houten met her first boyfriend, "Bobby," at 15. Van Houten stated, " 'It all happened after dad left. It's sort of like me looking for stability, caring, love.' " Bobby introduced her to LSD. She also began using alcohol and marijuana. Eventually she was using LSD and marijuana on a daily basis, and in high school her drug dealers were her closest friends.

At some point, Van Houten and Bobby ran away from home to San Francisco, but the communes would not let them stay

7

because they were too young.  Van Houten then discovered she was pregnant by Bobby, and she told her parents.

According to Van Houten, her father tried to figure out how Bobby and Van Houten could raise the baby, but Van Houten's mother said, " ' "You are not going to have this child, you're going to go to college." ' "  Van Houten stated, " '[A]t that point, I really, really wanted the child . . . and the fact that there was no negotiating with mom . . . mom was a hard force to rec[k]on with, she ran the roost.' "  Bobby's mother invited Van Houten and Bobby to live with her, " '[b]ut, for some reason in my mother's heritage she was very anti-Catholic, and she wouldn't even consider it.' "

Van Houten's mother arranged an illegal abortion. Van Houten described the abortion: " 'It was in my bedroom . . . some woman came up from Mexico.  She told me to just be quiet and not wake my brother or sister.' "  Van Houten was not medicated during the procedure.  Van Houten stated she " 'shut down,' emotionally" after the abortion.  The CRA evaluator wrote that Van Houten "was tearful as she spoke of the abortion and what 'might have been.' "  Years later, while incarcerated, Van Houten had a " 'wonderful psychologist' " who helped her "process many of the residual emotions" stemming from the abortion.

Van Houten and Bobby became involved in the self-realization movement, and would sit for hours meditating with one another.  They broke up sometime after high school graduation and Van Houten moved in with her father. Van Houten's mother wanted her to go to college, but " 'there was no way I'd agree to anything she said.' "

After graduation Van Houten was sober for a time, something the self-realization foundation promoted. Eventually, however, she got back in touch with Bobby and her old friends and began using drugs again. After finishing her courses at Sawyer Business School, she traveled with a friend to San Francisco, where she met two members of the Manson Family, Robert Beausoleil and Catherine Share. Share told Van Houten of " 'this wonderful place,' " presumably Spahn Ranch, and Van Houten, who " 'had no idea what I would do with my life,' " ended up driving up and down the coast with Share, Beausoleil, and another person, " 'going from commune to commune, panhandling.' " Van Houten "was intimate with [Beausoleil] and explained that the commune lifestyle called for multiple partners." Van Houten said, " 'I was not taking care of myself. I was numb after the abortion, I can't pinpoint emotions . . . .' "

Van Houten said life at Spahn Ranch at first " 'seemed fun, but underneath all the freedom was a really strict doctrine,' " which she did not realize until much later, after she had been incarcerated for several years. Van Houten said she was " 'indoctrinated' " at the ranch. If she said anything about her past, she would be mocked. She had to wear different clothes every day, because nothing could be hers. Manson " 'would do long length[y] tirades about our parents, and how they destroyed us. Everything that was intuitive in me was blocked by self-criticism. If I thought, ". . . that didn't make sense," [Manson would] begin this thing, like "no sense makes sense . . . ." He knew what he was doing.' "

Van Houten said, " 'I became indoctrinated slowly. I was broken enough that when someone said, "You need to come with me, [Manson is] special, he's like Christ reincarnated," I was so

broken, that I wanted to belong and I wanted to belong to something that wasn't connected to my past. And I allowed it to happen. I didn't realize . . . that this guy is messing with my head.' " Van Houten "explained that she realized how far she had allowed [Manson] to 'get in (her) head' once she started to regain her identity (after she was incarcerated)." Van Houten described two other women " 'from the ranch' " being placed in prison with her who " 'were still doing "the talk," ' " and Van Houten said to fellow inmate Krenwinkel, " ' "I'm different . . . I'm not doing this." ' "

Prior to the commitment offenses, Van Houten was arrested three times for grand theft auto and once for burglary. According to the CRA, she was released following two of the arrests for insufficient evidence, and the record did not indicate the disposition of the other two arrests.

### b.    The commitment offenses

The evaluator asked Van Houten to discuss the commitment offenses. Van Houten explained that in the winter of 1969, Manson " 'said things had changed and there would be a revolution.' " He spoke of " 'violence' " and began to prepare his followers " 'to be living in a constant state of fear,' " including by having them sneak up on one another " 'so our awareness was up.' "

At the time, Van Houten was motivated by a desire to show Manson she " 'was completely committed to him and his cause.' " " 'I felt I really needed to go . . . had to kill them for the beginning of the revolution.' " Asked why she felt it was important to demonstrate her commitment to Manson, Van Houten said, " 'He always made me feel that I wasn't quite measuring up to what he had hoped for and I needed to have him believe that in me, the

group, I needed to belong, it's an embarrassing thing to say at this age, how weak I was and how needy I was.' "

At the time, Van Houten believed she " 'had been chosen to be near this guy who had this vision and reincarnation . . . and made me feel I was obligated because of what I'd been given by him. He'd tell us, "If you leave, when the revolution comes, they'll do all this stuff to you and you're only safe with me." ' " Van Houten explained this is why she did not leave Manson when the opportunity presented itself, including when a biker Manson had thrown off the ranch returned and tried to get Van Houten to leave with him. Van Houten said, " '[I]t was like my feet were stuck in dried cement. I was so afraid to go. I said, "I can't," and [the biker] just took off.' "

Describing the night of the murders, she said, " 'I was told to follow everything Tex [Watson] said.' " She and Krenwinkel took knives from the La Biancas' kitchen and took Mrs. La Bianca into the bedroom. Van Houten held Mrs. La Bianca down on the bed. Van Houten did not recall putting a pillow case on Mrs. La Bianca's head, " 'but there's [a] good possibility I could have.' " When Mrs. La Bianca heard her husband dying in the next room, killed by Watson, she yelled out for him as Van Houten tried to hold her down. Krenwinkel stabbed Mrs. La Bianca and the knife bent on her collarbone. Van Houten " 'ran to the door of the bedroom, said, "We can't do it. We can't kill her." [Watson] came into the bedroom, [Krenwinkel] went into the living room, I stood at the doorway, none of this was conscious, I was running on fear. Tex had stabbed her. I assumed she was dead. That's been an issue of controversy for Board hearings. She could have been alive, but I assumed she was dead[.] Tex said, "Do something," and handed

11

me a knife.  So, I stabbed her in the lower torso 16 times.  It was a horrible, predatory feeling.' "

The evaluator asked Van Houten "how she felt," and Van Houten stated, " 'I felt horrible, aggressive, predatory . . . after that, I began to wipe fingerprints."  Krenwinkel painted the walls with blood while Watson took a shower.  At Watson's instructions, Van Houten changed into some of Mrs. La Bianca's clothes.  The group took some milk and cheese from the refrigerator and hitchhiked back to the ranch.

Van Houten stated that at the time, "she believed what they were doing was necessary and that although she was sorry that the victims had to die, she believed it was 'necessary for the greater good, the revolution.' "  Van Houten noted, " 'It was in the record that I told [a 13-year-old at the ranch] that the more I did it the more fun I had[.]  I don't deny it, but I don't remember.' "[5]

Asked about the "causative factors" leading to the commitment offense, Van Houten stated, " 'I feel that before my dad left, I was in a structure that really worked for me, and when dad left it shifted it, and it's not like dad leaving in '80 or '90; dad leaving in 1965 changed a lot in our small town.  That didn't happen that often.  It created a window for me where I began to move into a different set of kids, mostly single-parent kids, that led me to curiosity about drugs, led me to my boyfriend, and the

---

[5] According to the dissent from the opinion reversing Van Houten's conviction following her first trial, Manson cult member Diane Lake "testified that Van Houten told her she had stabbed a woman who was already dead, and that the more she did it the more fun it was."  (*People v. Manson* (1976) 61 Cal.App.3d 102, 227 (dis. opn. of Wood, P. J.); see *In re Van Houten*, *supra*, 116 Cal.App.4th at p. 346 [quoting same].)

abortion, which led me to wanting to get away from my mom and my family. Before the abortion, I was already involved in the hippy thing of criticizing our parents and looking for an alternate lifestyle . . . [.] [W]hen I left with [Beausoleil] and [Share], they told me all I have to do is cut from my past, so, I called my mom and told her I'm dropping out of society and you'll never hear from me again.' " " 'I went where I thought I'd be accepted and safe and cared for and instead it was the worst thing that could have happened.' "

Van Houten stated, " 'I was desperate to be accepted. I was weak, I was incapable of having original thoughts by the time I was at the ranch, my intellect had been smushed[.] I'm bright, but it wasn't working for me, I don't mean it in an egotistical way, but I'm bright, and I was doing all I could to not be. Desperate to be accepted, . . . I had no sense of value. My value came in the eyes of other people.' "

Asked how she was different now, Van Houten stated she was " 'a person of independence' " and " 'a socially conscious person. I don't run from my intellect.' " She said, " 'I feel it's very important that I not try to forget what happened. Learning to live with what I did is important.' " Van Houten "expressed remorse for the death of the victims and stated that even at the time of the crime she felt 'bad that this had to happen to them,' and clarified, 'Not that it shouldn't have happened . . . in my head, I had it like we were going to war.' " Van Houten "stated that now she feels 'very, very sorry . . . deeply sorry.' "

### c. Prison record

During her incarceration, Van Houten had participated in self-help programs and worked and volunteered in various capacities, including as a tutor. She earned a master's degree in

Humanities. At the time of the CRA, she was the chairperson of the Inmate Advisory Council, and was a facilitator in the Victim Offenders Education Group and Actor's Gang Prison Project. She belonged to a Narcotics Anonymous group, and an Aging in Prison group. She had "participated in mental health treatment groups such as stress management, cognitive therapy, and others . . . ."

Van Houten had a nearly spotless disciplinary record while in prison, having been written up only once in 1981 for "verbally communicating with women." Since her last parole hearing, Van Houten had remained free of discipline, and continued to participate in self-help programs and to work as assigned. "There is no indication that she has engaged in violence while incarcerated."

Van Houten said that after her third trial in 1978, she was briefly married while incarcerated. She explained, " 'I met him in the visiting room, he started writing to me . . . he was a grifter, nickel-and-dime crimes, and he said he was rehabilitated.' " Van Houten stated, " 'I wanted to be with somebody and have the three-day visits. He wanted to exploit me, though, and live off that, and I divorced him. He ended up doing a GTA and got arrested, and in the car he had . . . a [correction officer's] shirt, a female, so, they thought I was trying to escape, but they cleared me of it.' " At another point she corresponded with another man, "who ended up hanging himself."[6]

---

[6] In Van Houten's 2016 parole hearing, Van Houten was asked by the deputy district attorney about the man with whom she corresponded. The man, Michael Vines, was serving a life sentence in a prison in Texas. Van Houten said she first wrote to

14

### d. Clinical assessment

The evaluator reviewed Van Houten's prior psychological and risk assessments from 2007, 2010, 2013, and 2016, all of which indicated she presented a low risk for future violence.

The evaluator wrote that during the evaluation, Van Houten maintained appropriate eye contact and was cooperative, pleasant, well-spoken, and invested in the process. "She appeared to make an effort to be forthcoming with information and took time to provide thoughtful responses to questions posed to her." "There was no evidence of a thought disorder" or "indication that she was responding to internal stimuli or perceptual distortions of any kind (i.e., auditory, visual, or tactile hallucinations)." "There was no evidence of suicidal or homicidal thoughts or behavior . . . ."

Discussing Van Houten's history of substance abuse, the evaluator wrote that as a teenager, Van Houten used marijuana daily, and also used LSD, benzedrine, mescaline and methedrine. At Spahn Ranch she used LSD and marijuana, and was under the influence of LSD when she committed the life offenses. Van Houten reported she had now been sober for many years, stating, " 'I really believe I have an addictive gene that I keep an eye on. Also, it's extremely disrespectful for the family and the memory of my victims that I would use [drugs].' " Van Houten had committed no infractions related to substance abuse while in

_____

Vines in the early 1980's, when they were editors of their respective prison newspapers, and they continued corresponding off and on for 16 years. Asked what the nature of their communication was, Van Houten said, "Friends, prison romance, something to do with the opposite sex." Van Houten stated, "[H]e ended up in I think Illinois and he hung himself."

15

prison, and had participated in substance abuse treatment over the years, including Narcotics Anonymous. Her relapse plan should she be paroled included having a sponsor in the community and staying involved in treatment groups. Van Houten expressed her understanding "that sobriety upon parole is not synonymous with sobriety in the prison setting." The evaluator concluded Van Houten "met the relevant diagnostic criteria" for various substance abuse disorders given her drug use prior to incarceration.

Van Houten did not meet the criteria for a personality disorder. She had no disciplinary violations in prison apart from the one nonviolent incident in 1981. "There is no evidence of ongoing difficulty with rules or an attempt to violate the rights of others." The evaluator noted Van Houten had participated in self-help programs "and has made an effort to understand what contributed to the violence she perpetrated at age 19."

### e.   Assessment of risk for future violence

In assessing Van Houten's risk for future violence, the evaluator began with an analysis of "historic factors" (boldface, underscoring, & capitalization omitted). The evaluator wrote, "When Ms. Van Houten was 14 years old, her parents divorced. At 15, her boyfriend introduced her to drugs and she began to use LSD and marijuana, among other substances. She became pregnant in her teens and experienced the trauma of an unwanted abortion that was forced upon her by her mother. After the abortion, she felt emotionally numb. She was unable to assess or process her emotions at the time, and she delved even deeper into drug use. She eventually f[ound] herself with a group of individuals traveling along the coast. While involved with Manson's group, she engaged in various criminal acts and was

16

arrested, although not prosecuted. The historical predictive factors [of] prior violence, violent attitude, other antisocial behavior, troubled relationships, traumatic experiences, and substance abuse problems are present and relevant to future risk of violent recidivism."

The evaluator noted that Van Houten had a history of impulsive behavior, including drug use and promiscuity, and that her commitment offenses "reflected a callous lack of empathy for the victims." She did not, however, display "characteristics commonly seen in psychopathic individuals." During her nearly 50 years of incarceration "she has exhibited prosocial behaviors and has sought positive relationships with others. She has not shown herself to be deceptive, conning, or to lack remorse." Her score on a test designed to identify psychopathic tendencies "was below the mean of North American female inmates and below the cutoff or threshold commonly used to identify dissocial or psychopathic personality."

The evaluator found that Van Houten "demonstrated insight into the contributing factors of the life crime and was able to adequately discuss the causative factors involved. Over the years, she has participated extensively in self-help programs, including individual therapy, which have helped her understand the pertinent factors that allowed her to become involved in the life crime. Although she spoke of her susceptibility to the influence of Manson, she also wished to take full responsibility for her behavior without minimizing her role or externalizing blame. Ms. Van Houten's expressions of remorse for the victims appeared genuine. At present, the risk factor, lack of insight, is not present."

The evaluator noted that Van Houten likely would "experience some degree of stress as she paroles after such a lengthy incarceration," and that stress "may also be aggravated by potential notoriety due to her high profile case." "Stress," therefore, "is rated as . . . partially present and somewhat relevant to risk." Van Houten's stress, however, "will likely be mitigated by her decision to parole via [a] structured community program and by the support she expects to receive from friends/family."

The evaluator further noted that Van Houten's "ability and willingness to abide by the rules of parole is foundational for a successful parole." The evaluator found Van Houten had demonstrated her ability and willingness to follow the rules as evidenced by her lack of disciplinary incidents while incarcerated and her participation in programs to address the contributing factors of her commitment offenses.

The evaluator observed that having committed her offenses at age 19, Van Houten met the criteria for " 'youthful offender.' " The evaluator opined, "[I]t seems very likely that Ms. Van Houten's involvement in the life offense was significantly impacted by characteristics of youth, including impulsivity, the inability to adequately foresee the long-term consequences of her behavior, and the inability to manage her emotions that resulted from a forced abortion. These factors contributed to the notion of diminished culpability with respect to Ms. Van Houten's involvement in the life crime."

Since that time, Van Houten "appears to have benefited from the rehabilitation process." Van Houten "expressed what appeared to be genuine regret for her involvement in the life crime and she assumed full responsibility for her behavior,

18

without externalizing blame.  It appears she has spent decades attempting to understand, or gain insight into, the factors that led her to become involved with Manson and to believe wholeheartedly what she was instructed to believe."  Van Houten "has not shown herself to be violent in the many years of her incarceration," "has followed the rules of the institution, has participated in self-help programs and therapy extensively, [and] has earned positive reports from supervisors and clinicians."

As for her status as an "elderly" parole candidate, "[s]he appears to have benefited from the natural maturation that comes with age, as well as from the many years of programming offered by the institution."  "At present, her risk for violent reoffending is in the low range and it does not appear as though age-related concerns will impact her ability to parole successfully."

In conclusion, the evaluator stated that Van Houten represented a low risk for violent recidivism.  The evaluator noted the 2016 CRA had reached the same conclusion, and "[s]ince that time, [Van Houten] has continued to program in a positive manner."

## 4.    *Parole hearing and decision*

### a.    Hearing

The Board, represented by a presiding commissioner and deputy commissioner, held a parole consideration hearing for Van Houten on July 23, 2020, via videoconference.  The presiding commissioner, who was on the panel of Van Houten's previous parole hearing, began by summarizing Van Houten's preincarceration history, with Van Houten interjecting small corrections.  Van Houten confirmed that at the prior hearing,

19

asked to rank her anger at the time she told her mother she was leaving to travel with Beausoleil and Share, said she was a seven on a scale of one to 10.

The presiding commissioner then asked Van Houten to "talk about the life crime" and what led up to it. Van Houten said when she first arrived at the ranch, "it was, um, friendly kids with this older guy [Manson] that presented himself as . . . playful, fun. The goal at the ranch was to become one, one being, one mind." While the cult members were under the influence of LSD, Manson would tell them to let go of everything their parents had taught them. One woman in the group had undergone surgery as a child, and Manson suggested her parents had subjected her to the surgery "because she was too pretty." Van Houten noted that at the time, "I was carrying with me[ ] my history with my mom."

The cult at some point relocated to a different ranch in the desert, and Manson went "back into town." When he returned, "things began to change and he started to speak of a revolution, that the blacks had suffered and that the karma was going to change and they were going to win the revolution."

Manson and the cult began listening to the Beatles' White Album. Manson believed the Beatles were speaking to him, and references on the album to "son of man" referred to Manson, as the "Second Coming" of Jesus Christ. Manson had Van Houten read to him from the book of Revelation so he could "look for the different symbolism."

Van Houten described a ritual in which Manson would instruct one of the cult members to stand naked in the middle of a circle formed by the other members, and then criticize the cult member in an effort to "dismantle[e] our personalities."

Van Houten once was in the center of the circle and Manson criticized her for being "lost in thinking that [she] didn't understand him, that [she] needed to try harder." Van Houten said her humiliation turned into self-criticism.

The cult began to prepare for surviving the revolution, including preserving food and practicing sneaking up on one another. Manson believed they should all get used to living in fear, because that is how they would survive. The group also began to commit property crimes Manson called "creepy crawly," at which point Van Houten burglarized her own father's house. Manson began talking about "murder, killing, violence, surviving more, preparing our mind[s] to see things that would jar them . . . ."

As she had in the CRA, Van Houten described declining the opportunity to leave the ranch with the biker who wanted her to go with him. She said, "I felt like I was . . . frozen there, . . . that to leave was to put myself in grave danger because of all of the conversations about what was coming in the world."

Van Houten described talking to Krenwinkel the morning after Krenwinkel had participated in the killings at the Polanski residence, and Krenwinkel said "that Helter Skelter had started." Van Houten "knew that that meant people had been murdered. [Krenwinkel] said it didn't seem right, that the people were young and that one of the women was pregnant." Van Houten said that "[e]arly on, Manson had told me to stay close to [Krenwinkel], that she was close to him and that I should be around her. So, I knew that [Krenwinkel] had committed herself and crossed the line and I wanted to do the same." At the time, Van Houten was under the impression that the killings would continue, likely every night. "That it was now the way it was

21

going to be." Asked by the presiding commissioner if Van Houten at the time agreed with that plan, she said she did: "I believed in [Manson]. I believed in what he saw coming and I was committed to it."

Van Houten described the night of the commitment offenses. Manson, Van Houten, and several other cult members drove around Los Angeles, with Manson getting out occasionally to scout homes or buildings. They eventually stopped at the La Bianca residence—Van Houten did not know who lived there or why Manson selected it. Van Houten described killing the La Biancas, her description largely similar to her description in the CRA. As she had in the CRA, Van Houten stated that when she got back to the ranch, she told a girl "what had happened and I told her it was fun. I don't remember saying it, but it sounds like something I might've said at that time with who I was."

After the murders, Van Houten went to the desert to "continue[ ] to prepare for the revolution," including marching with backpacks and trying to survive on very little water. "[I]t was all . . . training and preparation until we were arrested."

The presiding commissioner asked Van Houten to discuss the causative factors leading to the murders. Van Houten said, "[W]hen I met Catherine Share, I was at an all-time bottom low. I had no income, I did not feel good about either of my parents, and when I met her, it seemed to me that I was being offered a pretty good life." At the ranch, she read a book that described a relationship "where one participant needs to be in control and the other person needs to have someone take control. And I view that as my initial relationship with Charles Manson. I didn't know what I was doing, I didn't know where I was going." She explained that she was among people that were drinking and

using LSD and marijuana, and she was "part of the hippie movement, looking for different lifestyles than what my parents offered me, and I was broken by the abortion. It really deeply wounded me." "I believe that the things that made me weak and lost were ultimately used as manipulations against me in my conversations with Manson and how Manson chose to relate to me. I didn't know it at the time. At the time, I thought he had great insight into what a horrible person I was at that time, by allowing my mom to set up the abortion. I had a lot of criticism about myself about that."

Van Houten stated, "I allowed myself to make the group more important than my early teachings of right and wrong. It was important that the people at the ranch felt that I was one of them and I was, and I sold myself out over and over." She said that during her LSD trips, Manson and the others would convince her that whatever "red flag[s]" she saw about the group were just "self-criticisms that I had not let go," because she had failed to "abandon[ ] the teachings that I received as a child," as Manson urged.

The presiding commissioner asked what Van Houten at the time hoped to gain from Manson's anticipated revolution, and what attracted her to that mentality. Van Houten answered, "Because Charles Manson was Christ-come back, I was obligated. Because I was close to him, I was obligated to see through what he knew had to happen." As for what she herself would gain, "I would be able to survive," and "I would be accepted by Manson, that he would know that I was very loyal to him."

The presiding commissioner asked Van Houten for the definition of a "false leader." Van Houten responded, "[A] false leader is someone who believes that they have all the

answers . . . .  False leaders manipulate the followers into adhering to the leader's belief system.  A false leader believes the[y're] right and everybody else is wrong.  A false leader . . . harms others."  She continued, "A false leader creates a singular point of view, and a false leader strips followers of their dignity and their humanity."

Van Houten then defined a true leader:  "A true leader encourages those that look to them, to flourish, to become the best that they can, are aware of those who are suffering, and does what they can to accommodate and help those, so that no one is left behind.  A true leader encourages others to be decision makers.  A true leader listens to the people rather than tell[ing] them.  A true leader shares their wisdom and listens to what they're being told."

The presiding commissioner asked Van Houten to look back and identify "signs or red flags" that she "needed to get [away from Manson] and do something different."  Van Houten said an early red flag was the criticism the cult members received from Manson about their individuality, and "[t]he fact that when we weren't around Manson, that we kept that same criticism going."  "[T]he agenda of the ranch was that we all become one, that we all become a finger on a hand, that we get . . . one thought, which was part of the LSD experience and all of that."  She recalled at one time Manson said he "thought [the] Black Panthers were coming to get us," and didn't allow anyone to disagree with him.  "That whole idea that it had to be his point of view, um, the violence that he would, um, inflict on people and the threat of it is an indicator now."

Van Houten estimated the first red flags appeared about a month after she arrived at the ranch.  She remembered everyone

took LSD, and Manson required them to commit to sitting all night without getting up.  Manson then said that he was leaving the ranch because no one had treated him decently, "and everybody flipped out.  It was a really bad LSD trip."  When Manson returned, he was more "aggressive."  On another occasion, Manson made the cult members all "bah like sheep."  He was also "violent to women," including breaking a chair over a woman's head when she stood up against his instructions.  "When I saw that all I did was get very afraid and think[ ] don't ever, don't ever stand up.  Don't, don't do this, don't do that.  I was . . . a compliant, weak human being, and I am not proud of that."

The presiding commissioner asked Van Houten what she thought at the time about people who did leave the cult, including a couple who fled across the desert to get away.  Van Houten said at the time she believed such people "weren't tuned in."  It did not occur to her to try to escape herself.  As an example of her devotion to Manson, she noted in one of the criminal trials she "testified I was at a crime I wasn't even at, to try to get Manson off."

Asked if there were any other factors that led to Van Houten "cooperating with such a delusional leader," Van Houten answered, "The main factors were that I was . . . a very weak person that took advantage of someone that wanted to take control of my life and I handed it over."  At the time, "I believed I was right doing that."  As for why she continued to follow Manson even after it became evident the cult was turning violent and Van Houten would have to kill people, she said, "I believed in Manson.  I believed in his belief system, I felt obligated to participate.  I wanted to participate.  I believed that it was something that had to be done," because Manson said so.

The presiding commissioner asked Van Houten how she "handle[d]" it when she was in the La Biancas' bedroom hearing Watson murder Mr. La Bianca in the next room. Van Houten stated, "Not well. I believed that I was[ ] in over my head, and I became very critical of myself because I felt that I wasn't carrying my weight." The presiding commissioner asked, "And carrying your weight was to mutilate those people?" Van Houten said, "Yes." She continued, "So even at a time when I should have had a bit of humanity, it became self-criticism . . . ."

The presiding commissioner asked Van Houten to talk about the impact of her crimes. Van Houten answered, "[W]hen I found out that it was Frank Struthers that came home and discovered his mom, I know that it devastated him, and that has been hard for me to, um, live with. I know that my crime hurt the LaBianca [f]amily and I listen [at] every board hearing to how it has impacted them. I know how the crimes have impacted those that were at the first night, Sharon Tate, and her sister and her family and the others. I know that because it wasn't an early arrest that the Los Angeles area lived in fear. I know that for those that came in and did the investigation, that it . . . affected them, that they were exposed to things that would not leave their conscience. I know that it affected my family. My brother and sister who were still in school had a very hard time." She continued, "[I]t devastated . . . my own family, my neighborhood, those that knew me." Van Houten stated, "[M]y crime affected the nation. It brought an end to a time period in the '60s. It impacted other people in other countr[ies] and it continues to."

Asked about her impact on Mr. and Mrs. La Bianca themselves, Van Houten said of Mrs. La Bianca, "I robbed her of her ability to live a life, see grandchildren, become whoever she

26

was, flourish, stole her life. She didn't deserve it. She didn't in any way, have it coming. She was living her life. No relationship." Regarding Mr. La Bianca, "I robbed him of being able to enjoy his family, who loved him dearly. To see through those things that he enjoyed, play with grandchildren, be present at holidays, see the fruits of all of his labors. He was an innocent victim and I robbed him of his life."

Asked what she would have done differently in her life looking back on it now, Van Houten said she would have been more supportive of her mother, rather than blame her and become rebellious. She wished she had followed her intuition and left the ranch "when things began to change." "Regarding the murders, on hindsight, I wish I could have gone to the police and talked to someone before it ever started." She also wished she had not started smoking marijuana and getting involved with the boyfriend who got her pregnant, all of which "were spearheaded by my anger and rebelliousness at my mom and feeling that dad had left me."

Asked when she first had any intuition to leave the ranch, she said, "[T]he first time was when I'd probably been there about a week and Manson started to turn on me for having too much ego and not surrendering. And instead of following that, I really thought, wow, I need to work on myself and see what he's talking about. It got the better of me, and then it just went downhill from there."

The deputy commissioner went over Van Houten's postconviction record with her. Van Houten had earned a B.A. and M.A. while in prison. She had no additional academic history or vocational training since her last parole hearing. She continued to work as chairperson of the Inmate Advisory

Committee and was volunteering as a tutor.  Her reviews were "still exceptional.  They still say you're dependable and efficient, so it hasn't changed for many years."  Van Houten had not committed any rule violations since her last hearing, and her last written discipline was in the 1980's.  Although Van Houten had twice participated in the Victim's Offender Group, she was no longer participating because having previously participated she was now ineligible under prison rules.  She participated in Alcoholics Anonymous.  Prior to the COVID-19 emergency, she was facilitating a program called Helping Women Recover, and was training to facilitate a program called the If Project.  She was also participating in therapy groups.

Asked to explain what a healthy relationship is, Van Houten answered, "[I]t's two individuals that come together and there is room to disagree, there is room to have discussions and not attack, that there are individual interests, that it's not symbiotic, that it's something where the two individuals choose to enjoy each other's company and help each other become the best human beings that they can become and work out their problems in a civil manner."  She would deal with an unhealthy relationship by "bring[ing] up to the individual what I'm beginning to feel and that it's not working out for me."  "And hopefully they would hear me and if they did not, and at that point, they try to change my personality to meet their needs, I would leave it."

Asked whether she had gained any new insights from her most recent programming, Van Houten said in one program she learned about how the body and brain are connected, "[a]nd if you can understand what's going on, like if I can say, wow, I'm . . . really feeling tense right now, if I can read that in myself, then I

can see where it's going in my head that can help with relapse, bad relationships, just about everything." Also, by facilitating the Helping Women Recover program, which involved younger women, "sometimes, I was able to see who I was then and who I am now. And . . . that was helpful to me to see that."

Van Houten explained her plan to prevent relapse into substance abuse, identifying a person she hoped would be her sponsor, and stating she had friends she could talk to. The deputy commissioner noted Van Houten had participated in Narcotics Anonymous and similar programs since 1994.

Asked what advice she would give her younger self, Van Houten said to "slow down and talk with me about what's going on inside." "I would really stress learning to measure consequence."

The deputy commissioner noted the Board had received letters opposing Van Houten's release, and summarized four of them. One writer was concerned Van Houten would fall back into bad relationships. Another believed Van Houten was a sociopath. Another thought Van Houten had no remorse. Another "wrote in, as a concerned California citizen." Other than naming the writers, the record does not indicate whether the writers knew Van Houten or merely were expressing concern based on their awareness of her crimes.

The deputy commissioner also summarized letters from people who supported Van Houten's release. An expert on cults who regularly met with Van Houten about once a year opined that Van Houten was free of Manson's influence. Van Houten's brother wrote in support of her release. A former high school classmate of Van Houten's wrote that she would provide $12,000 a year to support Van Houten upon her release. There were

15 letters supporting her release from people who met her while she was incarcerated, including a former associate warden. A former inmate wrote about a meeting of "former lifers who thought that [Van Houten was] at the core of their rehabilitation." Another former inmate offered to support Van Houten with her 12-step program. Two friends of Van Houten each offered to provide her with housing.

Asked about her housing plans upon parole, Van Houten stated she would prefer to start in a transitional program, and had a particular one in mind run by a former prison employee and parole officer for whom Van Houten previously had worked. Van Houten listed a number of possible employment options, and the deputy commissioner read from letters in which people offered to assist Van Houten in finding work.

The presiding commissioner asked, "[W]hat's caused your behavior to be nonviolent for 50 years?" Van Houten answered, "[W]hen they abolished the death penalty, I knew that I, number one, was going to have to live with what I did. And also, it was like a new beginning for me. And I made a commitment to myself that I would not deliberately hurt another human being, both physically, emotionally. And I was young, so there have been times I've made mistakes and I'm sure that I have hurt people along the way. But my goal has always been [to] be someone that encourages and cares and, um, I just live my life like that. I don't, I don't respond violently. When, when I get angry, my first response is not to lash out. My first response is to step away, evaluate. You know, that's, that's how I handle severe frustration."

Asked how she would respond to a high-risk situation in the future, Van Houten said she would contact her therapist,

remove herself from the high-risk situation, and contact the police if appropriate. She would let her parole agent know immediately.

The presiding commissioner then discussed the 2018 CRA. The commissioner noted the evaluator's comments that Van Houten was pleasant, well-spoken and invested in the interview process, in which she provided thoughtful responses. The commissioner further noted that Van Houten's test scores showed she was below the threshold commonly used to identify antisocial or psychopathic personality. The commissioner acknowledged, as did the CRA, that Van Houten was subject to special parole considerations for both youthful offenders and elderly inmates, and noted the CRA's statement that Van Houten had taken every opportunity to make positive changes with respect to education, vocation, and self-help. Finally, the commissioner noted the evaluator's conclusion that Van Houten presented a low risk of future violence.

In response to clarifying questions from the deputy district attorney in attendance, Van Houten stated at the time of her crimes she believed the consequence of the murders would be to spark the revolution predicted by Manson. Asked to explain why she "disregarded what her parents and the church taught her," Van Houten stated, "I was turning my back on the foundation of what makes a civilized society. I was turning my back on my parents" because of the abortion. "I turned my back on the church because I felt that I had found a person who was redefining it, you know. I had already turned my back on the conventional by studying with [the] self-realization fellowship."

Van Houten then answered questions from her attorney. Asked what the consequences were if she displeased Manson,

31

Van Houten said, "[I]f I was going along with the program, then my life was pretty steady.  If I . . .  didn't, then there was a repercussion, humiliation."  Asked if her encounters with law enforcement prior to the commitment offenses, none of which resulted in charges, led her to believe there would be no consequences for her crimes, she stated at the time she was only concerned with the impending revolution, and was not thinking about legal consequences or being arrested.  Van Houten at the time believed she was obligated to dedicate herself to Manson because in her view he was Christ, and were she to give up her life for him her spirit would live on forever.  If she found herself among a violent group today, she would leave and report them: "I wouldn't find myself that long around people that think like that.  I . . . don't in here, you know.  I don't . . . put myself around violent people."  Van Houten also discussed her work with the Inmate Advisory Committee.  She said if granted parole she wanted to continue working to reduce recidivism rates.

The deputy district attorney gave a closing statement in which she argued Van Houten's was a rare case in which the circumstances of the life crimes alone justified denial of parole.  She described the crimes, not only of Van Houten, but of other Manson cult members, and the impact of those crimes on society.  She argued that because Van Houten had adopted Manson's ideology, "every act of this terrorist organization is imputed to her."  She contended Van Houten also had not shown sufficient insight into her reasons for committing her life offenses to satisfy the Governor's past concerns, although beyond making this statement the deputy district attorney did not identify anything in the record indicating insufficient insight.

Van Houten's attorney gave a closing statement, urging her release on parole. Van Houten gave her own closing statement, stating, "I [want to] say thank you for having this opportunity today to speak with you. I've answered every question that I can in the most honest way possible. I have worked very hard to become the person that I am today. I regret and have deep remorse for my actions. I offer the sincerest apology to the LaBianca [f]amily and to those that were . . . victims at the Tate house. I'm terribly sorry for the devastation I caused in everyone's life and I do my best to make recompense in who I am today. I appreciate this opportunity, and I hope that I was able to convey to you the sincere nature of my heart today. Thank you."

The Board then heard statements from Sharon Tate Polanski's sister, Debra Tate, and Mr. La Bianca's nephew, Louis Smaldino, both of whom objected to Van Houten's release. Tate stated, inter alia, that there was information of which the Board was unaware, specifically details about the Manson cult's crimes that Tate had learned from attending parole hearings of other cult members, which Tate believed indicated Van Houten was "not coming clean with everything." Tate believed Van Houten had failed to apologize for her actions except during parole hearings, and that her parole hearing testimony was inconsistent hearing to hearing. Tate claimed to have been threatened by supporters of the imprisoned Manson cult members, and believed the cult members continued to communicate with one another. Tate noted Van Houten's past correspondence with a man convicted of a double homicide who then committed suicide (Michael Vines, see fn. 7, *ante*). Tate characterized Van Houten's relationship with Vines as "romantic," and believed it suggested

33

Van Houten "still has questionable taste or perhaps is attracted to the same kind of person." Apart from her statement to the Board, the record does not indicate Tate provided any additional evidence against Van Houten.

Smaldino said he had attended 15 of Van Houten's parole hearings, and accused her of repeatedly downplaying her role by claiming she had been forced to commit the crimes, had been abused, or had only stabbed Mrs. La Bianca after Van Houten believed she was dead. He believed Van Houten was a willing participant in the killings. He described the impact of the crimes on his family, noting the emotional harm inflicted upon them, and the loss of the family grocery business after Mr. La Bianca's murder.

### b.    Board's decision

Following a recess, the Board issued a decision finding Van Houten suitable for parole. Pursuant to Penal Code section 3051, subdivision (a), Van Houten qualified as a "youthful offender" at the time of the life crimes, and the Board found that her positive behavior over the subsequent 50 years "indicates that [she has] participated in long-time reflection, maturity of judgment, . . . appreciation of human worth, and remorse for the things that [she] did when [she was] 19 years old."

The Board considered the circumstances showing unsuitability for parole, and found them outweighed by circumstances suggesting suitability. The Board described Van Houten's crimes as "extremely heinous, cruel, really disturbing, . . . dispassionate." Her "reasons for committing the offense, [her] anger, [her] greed, [her] selfishness, [her] delusional belief system, [her] extreme gang mentality, in no way, justified [her] actions." The Board considered Van Houten's prior

34

criminality, including "self-reported theft and drug use," and her "prior unstable social behavior" such as her relationship with her parents, her drug and alcohol use, and her running away. "However, the panel recognizes that after a long period of time, factors such as the commitment offense, prior criminality, and unstable social history . . . no longer indicate a current risk of danger to society in light of a lengthy period of rehabilitation . . . ."

The Board then addressed the circumstances indicating Van Houten was suitable for parole. She had no history of violent crime apart from the commitment offenses, either before those offenses or during her 50-year incarceration. She had a stable social history while incarcerated as indicated by her lack of disciplinary reports and her positive programming. The presiding commissioner said, "I've done over a thousand cases, done over a thousand hearings, and you're one of the best programming inmates I've seen."

The Board found Van Houten's expressions of remorse and her acceptance of responsibility to be consistent with her positive behavior. Her current age "reduces the probability of recidivism." The presiding commissioner praised her work with the Victim Offenders Education Group, which Van Houten had "handled . . . with grace and maturity," and recalled a graduation event he attended at the prison at which speakers indicated that Van Houten had had a positive impact on their lives.

The Board further noted Van Houten had created a "significant support system inside prison for [herself], as well as other people," and had also developed a support system outside to make her transition out of prison "as smooth as [she] could possibly make it." The Board found Van Houten had realistic

residential plans, marketable skills, and had demonstrated means for support upon release.

The Board referred to the 2018 CRA finding Van Houten to present a low risk of future violence, which was consistent with "decades" of psychological evaluations of Van Houten. The Board quoted at length from the 2018 CRA, including Van Houten's insight into the contributing factors of her life crimes, the role Van Houten's youth played in those crimes, and the lack of findings of antisocial or psychopathic behaviors. The Board noted its earlier decisions granting Van Houten parole, and found Van Houten had "maintained steady behavior and continued growth" since then.

**5.    *Governor's reversal***

On November 27, 2020, the Governor issued a written decision reversing Van Houten's parole. The decision began with a summary of the Manson cult and its ideology, a description of the murders at the Polanski residence, and a description of the murders of the La Biancas.

The Governor wrote that he "carefully examined the record for evidence demonstrating Ms. Van Houten's increased maturity and rehabilitation, and gave great weight to all the factors relevant to her diminished culpability as a youthful offender." The Governor "acknowledge[d] that Ms. Van Houten has made efforts to improve herself in prison," and listed programs in which she had participated or facilitated, including Narcotics Anonymous, the Victim Offender Education Group, and the Actors' Gang Prison Project. The Governor noted Van Houten's educational and vocational advancements, her service on the Inmate Advisory Council, and her "exemplary disciplinary record." "However, these factors are outweighed by negative

36

factors that demonstrate she remains unsuitable for parole at this time."

The Governor wrote, "Ms. Van Houten's explanation of what allowed her to be vulnerable to Mr. Manson's influence remains unsatisfying. At her parole hearing, Ms. Van Houten explained that she was turning her back on her parents following their divorce and after a forced abortion. She described herself at the time of her involvement in the Manson Family as a 'very weak person that took advantage of someone that wanted to take control of my life and I handed it over.' I am unconvinced that these factors adequately explain her eagerness to submit to a dangerous cult leader or her desire to please Mr. Manson, including engaging in the brutal actions of the life crime."

The Governor further stated, "I remain concerned by Ms. Van Houten's characterization of her participation in this gruesome double murder, part of a series of crimes that rank among the most infamous and fear-inducing in California history." The Governor quoted Van Houten's statements from the CRA and parole hearing describing her desire to show Manson she was committed to his cause, and her sense of obligation to kill for him. He quoted her description in the CRA of the commitment offenses, ending with her statement that when she stabbed Mrs. La Bianca, " 'It was a horrible, predatory feeling.' " The Governor found Van Houten's statement "that committing the offense was 'horrible' conflicts with her subsequent conduct. After the murders, Ms. Van Houten reportedly told a young female follower of Mr. Manson that participating in the murders was 'fun.' Moreover, she continued to follow Mr. Manson's instructions and 'continued to prepare for the revolution' until she was arrested. The inconsistency

37

indicates gaps in Ms. Van Houten's insight or candor, or both, which bear on her current risk for dangerousness."

The Governor wrote, "The evaluating psychologist noted that several historical factors including 'prior violence, violent attitude, other antisocial behavior, troubled relationships, traumatic experiences, and substance abuse problems are present and relevant to future risk of violent recidivism.' These factors remain salient despite Ms. Van Houten's advanced age and remain cause for concern should she be released into the community."

The Governor concluded, "Given the extreme nature of the crime in which she was involved, I do not believe she has sufficiently demonstrated that she has come to terms with the totality of the factors that led her to participate in the vicious Manson Family killings. Before she can be safely released, Ms. Van Houten must do more to develop her understanding of the factors that caused her to seek acceptance from such a negative, violent influence, and perpetrate extreme acts of wanton violence."

6.      *Denial of petition for writ of habeas corpus by superior court*

Van Houten challenged the Governor's decision through a petition for a writ of habeas corpus in the trial court. The trial court ruled there was evidence in the record to support the reversal of parole. The court noted that Van Houten's commitment offenses were heinous, atrocious, and cruel, and that in the 2004 *In re Van Houten* opinion, the appellate court concluded the "character of the offense" alone justified denying parole. The court found the historical psychological factors the Governor quoted from the CRA supported an unsuitability

finding. The court further found the Governor's determination that Van Houten lacked insight "into exactly what led her to follow such a dangerous man and blindly accept his teachings" supported the reversal decision.

The trial court also read the Governor's decision as finding Van Houten was unsuitable for parole because she had "minimized her culpability in the murders." The court noted that Van Houten had told the Board "she held Mrs. La Bianca down while Krenwinkel stabbed the victim," and "also told the Board that she assumed the victim was dead when she personally stabbed the victim 16 times." "The Governor's finding that [Van Houten] minimized her role in the murders is also some evidence of current dangerousness."

The trial court rejected Van Houten's other arguments, finding the Governor adequately considered her status as a youthful offender, her continued incarceration did not violate the constitutional prohibitions against cruel and unusual punishment, and the Governor's power to reverse parole decisions did not violate constitutional guarantees of equal protection under the law. The court declined to address arguments concerning equitable estoppel and Van Houten's right to access certain evidence, concluding those claims had been raised and rejected in earlier habeas petitions. The court also declined to address the argument that the Governor's reversal was untimely because that issue was under consideration by the Court of Appeal.[7]

---

[7] This court later denied Van Houten's challenge to the timeliness of the Governor's decision.

Following the trial court's denial of her petition, Van Houten filed an original petition for habeas corpus in this court. After requesting and reviewing opposition from the Attorney General, we issued an order to show cause and received full briefing from the parties.

## DISCUSSION

### A.    Applicable Law

#### 1.    *Suitability for parole*

The governing regulations provide that "a life prisoner shall be found unsuitable for and denied parole if in the judgment of the [Board] the prisoner will pose an unreasonable risk of danger to society if released from prison." (Cal. Code Regs., tit. 15, § 2402, subd. (a).)[8] "[T]he fundamental consideration in parole decisions is public safety," which requires "an assessment of an inmate's *current* dangerousness." (*In re Lawrence* (2008) 44 Cal.4th 1181, 1205 (*Lawrence*).

The regulations specify circumstances indicating both an inmate's suitability and unsuitability for parole. Circumstances indicating unsuitability include that the prisoner has "committed the offense in an especially heinous, atrocious or cruel manner." (Regs., § 2402, subd. (c)(1).) Factors to be considered in determining the severity of the commitment offense include whether there were "[m]ultiple victims," whether "[t]he offense was carried out in a dispassionate and calculated manner," whether "[t]he victim was abused, defiled or mutilated during or

---

[8] Further regulatory citations are to title 15 of the California Code of Regulations.

after the offense," whether the manner in which the offense was committed "demonstrates an exceptionally callous disregard for human suffering," and whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." (*Ibid.*)

Other circumstances tending to indicate unsuitability for parole include that the inmate "on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age"; "has a history of unstable or tumultuous relationships with others;" "previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim"; "has a lengthy history of severe mental problems related to the offense"; and "has engaged in serious misconduct in prison or jail." (Regs., § 2402, subd. (c).)

Importantly, "the mere presence of a statutory unsuitability factor" is not "the focus of the parole decision"; rather, there must be "reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness." (*Lawrence*, *supra*, 44 Cal.4th at p. 1210.)

Circumstances tending to show that the prisoner is suitable for release include that the prisoner (1) "does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims"; (2) "has experienced reasonably stable relationships with others"; (3) "performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense"; (4) "committed his crime as the result of significant stress in his life, especially if the stress

41

has built over a long period of time"; (5) at "the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome . . . and it appears the criminal behavior was the result of that victimization"; (6) "lacks any significant history of violent crime"; (7) "present age reduces the probability of recidivism"; (8) "has made realistic plans for release or has developed marketable skills that can be put to use upon release"; and (9) has engaged in "[i]nstitutional activities [that] indicate an enhanced ability to function within the law upon release." (Regs., § 2402, subd. (d).)

   With exceptions not relevant here, the Penal Code imposes additional considerations when the Board is determining parole for youthful offenders—those who committed their offenses at the age of 25 years or younger—and "elderly" inmates—those who are 50 years or older and have served a minimum of 20 years on their current sentence.  (Pen. Code, §§ 3055, 4801.)  In the case of youthful offenders, the Board "shall give great weight to the diminished culpability of youth as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law."  (*Id.*, § 4801, subd. (c).)  In the case of "elderly" inmates, the Board "shall give special consideration to whether age, time served, and diminished physical condition, if any, have reduced the elderly inmate's risk for future violence."  (*Id.*, § 3055, subd. (c).)

### 2.    *Governor's review*

   After the Board finds an inmate suitable for release on parole, the Governor may conduct an independent de novo review of the entire record to determine whether the inmate currently poses a threat to public safety.  (Cal. Const., art. V, § 8, subd. (b);

42

*In re Shaputis* (2011) 53 Cal.4th 192, 215, 220–221 (*Shaputis*).) " ' "[T]he Governor's decision must be based upon the same factors that restrict the Board in rendering its parole decision," ' " but the Governor may be " ' "more stringent or cautious" ' " than the Board in deciding whether the inmate poses an unreasonable risk to the public. (*In re Prather* (2010) 50 Cal.4th 238, 257, fn. 12.)

We review the Governor's decision under the "some evidence" standard, a standard our Supreme Court has called "extremely deferential." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 665 (*Rosenkrantz*).) Under that standard, a simple modicum of evidence is all that is required to uphold the Governor's decision. (*Shaputis*, *supra*, 53 Cal.4th at p. 210.) "Only when the evidence reflecting the inmate's present risk to public safety leads to but one conclusion may a court overturn a contrary decision by . . . the Governor." (*Id.* at p. 211.)

In applying the "some evidence" standard, "[t]he court is not empowered to reweigh the evidence." (*Shaputis*, *supra*, 53 Cal.4th at p. 221.) " 'Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of . . . the Governor," and it is left to the Governor's discretion how " 'the specified factors relevant to parole suitability are considered and balanced.' " (*Id.* at p. 210.) " 'It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the . . . decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to

43

ascertaining whether there is some evidence in the record that supports the . . . decision.' [Citations.]" (*Ibid.*)

In reviewing an order reversing a grant of parole, we may look to the entire record for evidence supporting the reversal, and are not limited to the evidence specified in the Governor's written decision. (*Shaputis, supra*, 53 Cal.4th at pp. 214–215, fn. 11.)

## B. The Governor's Decision Is Not Supported By the Record

Acknowledging the Governor's constitutional authority to reverse grants of parole, and our extremely deferential standard of review of the exercise of that authority, we nonetheless conclude that the Governor's reversal in this case is not supported by a modicum of evidence in the record.

### 1. *The Governor's stated reasons for reversal are not supported by the record*

We begin by addressing the reasoning expressly stated in the Governor's decision. The Governor found that Van Houten's "explanation of what allowed her to be vulnerable to Mr. Manson's influence remains unsatisfying," and he was "unconvinced" that Van Houten's parents' divorce and her forced abortion "adequately explain her eagerness to submit to a dangerous cult leader or her desire to please Mr. Manson, including engaging in the brutal actions of the life crime."

Our Supreme Court has held that an inmate's "failure to 'gain insight or understanding into either his violent conduct or his commission of the commitment offense' support[s] a denial of parole." (*Shaputis, supra*, 53 Cal.4th at p. 218.) "[T]he presence or absence of insight is a significant factor in determining whether there is a 'rational nexus' between the inmate's

44

dangerous past behavior and the threat the inmate currently poses to public safety." (*Ibid.*) "[A] 'lack of insight' into past criminal conduct can reflect an inability to recognize the circumstances that led to the commitment crime; and such an inability can imply that the inmate remains vulnerable to those circumstances and, if confronted by them again, would likely react in a similar way." (*In re Ryner* (2011) 196 Cal.App.4th 533, 547 (*Ryner*).)

In taking issue with the adequacy of Van Houten's explanation of the causative factors leading to her life crimes, we presume the Governor found Van Houten had an inability or unwillingness "to recognize the circumstances that led to the commitment crime," thus raising the possibility that Van Houten "remains vulnerable to those circumstances" such that she might reoffend. (*Ryner*, *supra*, 196 Cal.App.4th at p. 547.) The question is whether the Governor's conclusion is supported by some evidence in the record.

We hold it is not. It cannot be said that Van Houten has not extensively identified and discussed the factors leading to her life crimes, only some of which briefly are referenced in the Governor's decision. In both her interview with the CRA evaluator and at the parole hearing, Van Houten expounded at length on the causative factors, beginning with her feelings of anger and abandonment after her parents' divorce, a stigmatizing event in that era, and how that led to drug and alcohol abuse. She ran away from home with her boyfriend, who had impregnated her. Her mother then forced her to have an illegal abortion against her wishes, unmedicated, in her bedroom, instructed to keep quiet so as to not wake her siblings. Van Houten spoke of shutting down emotionally and feeling

45

numb after the abortion.  The CRA evaluator wrote that, even now, Van Houten "was tearful as she spoke of the abortion and what 'might have been.' "  Van Houten described herself at that point in time as being " '[d]esperate to be accepted,' " and " 'ha[ving] no sense of value.  My value came in the eyes of other people.' "

Van Houten stated when she met Manson cult member Catherine Share, she "was at an all-time bottom low.  I had no income, I did not feel good about either of my parents, and when I met her, it seemed to me that I was being offered a pretty good life."  She described how Manson slowly indoctrinated her, often while she was under the influence of LSD.  The cult was not murderous and violent at the outset—rather, she stated her time at the ranch initially " 'seemed fun,' " and the talk of and preparation for violence and revolution came later.  Van Houten said she " 'wanted to belong and . . . wanted to belong to something that wasn't connected to my past.' "  Van Houten explained how Manson used her anger with her parents and her shame about the abortion to convince her to turn her back on society, accept the alternative lifestyle he offered, and reject the lessons of right and wrong she had learned in her youth.  Manson successfully transformed any doubts Van Houten had about the cult into her own self-criticism for failing to achieve the enlightenment he purportedly offered.  By the time Manson's talk turned to violence and murder, Van Houten already had fully committed to him, so much so that she believed he was Christ reborn.  She also believed in the impending revolution, and that remaining with Manson was key to her survival.

The Governor found Van Houten's extensive discussion of the causative factors inadequate to explain her life crimes.  This

46

necessarily implies the Governor believes there are additional factors for which Van Houten has failed to account, factors that, unaddressed, create a risk of violent recidivism.

There is no indication in the record, however, of a latent underlying factor that potentially could result in violent conduct, nor has the Governor identified one. The CRA evaluator found Van Houten did not meet the criteria for psychopathy or a personality disorder, and there was no evidence of a thought disorder, hallucinations, or homicidal or suicidal thoughts or behavior. The evaluator further found it "very likely" that Van Houten's youth at the time "significantly impacted" her involvement in the life offense, a factor obviously no longer applicable five decades later. The CRA's finding that Van Houten presented a low risk of recidivism was consistent with similar evaluations over many years. Van Houten, moreover, has no history of violence either before the life crimes or in the 50 years since, and the prison staff regarded her highly enough to place her in positions of leadership within the prison, including facilitating groups intended to help other inmates with their rehabilitation.

The record shows no additional factors Van Houten has failed to articulate, or what further evidence she could have provided to establish her suitability for parole. The Governor's concern that there is more than meets the eye is, on this record, speculation, but the Governor's "decisions must be supported by some *evidence*, not merely by a hunch or intuition." (*Lawrence*, *supra*, 44 Cal.4th at p. 1213.)

In *Ryner*, the appellate court upheld the trial court's overturning of the Governor's parole reversal, finding that when "undisputed evidence shows that the inmate has acknowledged

the material aspects of his or her conduct and offense, shown an understanding of its causes, and demonstrated remorse, the Governor's mere refusal to accept such evidence is not itself a rational or sufficient basis upon which to conclude that the inmate lacks insight, let alone that he or she remains currently dangerous." (*Supra*, 196 Cal.App.4th at p. 549.)

The *Ryner* court reasoned, "[W]e have to question whether anyone can ever fully comprehend the myriad circumstances, feelings, and current and historical forces that motivate conduct, let alone past misconduct. Additionally, we question whether anyone can ever adequately articulate the complexity and consequences of past misconduct and atone for it to the satisfaction of everyone. Indeed, the California Supreme Court has recognized that 'expressions of insight and remorse will vary from prisoner to prisoner and . . . there is no special formula for a prisoner to articulate in order to communicate that he or she has gained insight into, and formed a commitment to ending, a previous pattern of violent behavior.' " (*Ryner*, *supra*, 196 Cal.App.4th at p. 548, quoting *In re Shaputis* (2008) 44 Cal.4th 1241, 1260, fn. 18.) The court continued, "[O]ne always remains vulnerable to a charge that he or she lacks sufficient insight into some aspect of past misconduct even after meaningful self-reflection and expressions of remorse." (*Ryner*, at p. 548.) "[A]lthough a 'lack of insight' may describe some failure to acknowledge and accept an undeniable fact about one's conduct, it can also be shorthand for subjective perceptions based on intuition or undefined criteria that are impossible to refute." (*Ibid.*)

As in *Ryner*, we hold that, on this record, the Governor's dissatisfaction with Van Houten's insight appears to be a "mere

48

refusal to accept" her description of what led her to be an acolyte of the Manson cult and its murderous objectives, as well as the evidence of her rehabilitation. As we have explained, the record provides no basis to support that refusal.

The Governor's other stated reasons to reverse Van Houten's parole do not withstand scrutiny. The Governor found a discrepancy between Van Houten's statements now and her purported statements and actions shortly after she committed the life crimes, which "indicates gaps in Ms. Van Houten's insight or candor, or both." Specifically, the Governor referred to Van Houten's current description that stabbing Mrs. La Bianca " 'was a horrible, predatory feeling,' " and contrasted that with Van Houten reportedly telling a fellow cult member the day after the murder that it was " 'fun.' " The Governor further noted that Van Houten " 'continued to prepare for the revolution,' " which we presume the Governor was suggesting is inconsistent with Van Houten's indication that she felt horrible about the murder.

The record does not support the Governor's conclusion that Van Houten's statements suggest a lack of insight or candor. Van Houten's bravado to the fellow cult member[9] and her continued involvement with Manson following the murders are completely consistent with her current description of her attitude at the time, which was to prove her devotion to Manson and the cult and suppress any personal misgivings she may have had about the killings.

---

[9] Van Houten told both the CRA evaluator and the Board she did not recall telling the cult member the murder was fun, although she did not deny doing so.

49

More important, it is unreasonable to compare Van Houten's description of her emotions during the crime now, after decades of therapy, self-help programming, and reflection, to how she characterized her feelings at age 19, while still deeply enmeshed in drug abuse and the Manson cult. The 19-year-old, drug-addled Van Houten characterized the surge of adrenaline and emotion she felt committing her first murder as "fun," whereas the 69-year-old Van Houten, looking back, would realize those feelings in fact reflected aggression and predation.[10] The Attorney General argues one cannot feel something is "fun" and also "horrible, aggressive, predatory," but these are descriptions given 50 years apart, through very different lenses.

The Governor also referenced the CRA's listing of " 'historical factors' " that were " 'present and relevant to future risk of violent recidivism,' " including " 'prior violence, violent attitude, other antisocial behavior, troubled relationships, traumatic experiences, and substance abuse problems.' " The Governor wrote, "These factors remain salient" and give "cause for concern."

These historical factors are, of course, historical, meaning they are immutable factors arising from Van Houten's past conduct and experiences. Our Supreme Court has cautioned that, although the Governor may base a parole reversal on "immutable facts" such as the "circumstances of the offense" or an "inmate's criminal history," the Governor may do so only "if those facts support the ultimate conclusion that an inmate *continues* to pose an unreasonable risk to public safety." (*Lawrence*, *supra*,

---

[10] Van Houten was 69 years old at the time of the 2018 CRA.

50

44 Cal.4th at p. 1221.)  In *Lawrence*, the court held the Governor could not rely "solely upon the immutable circumstances of the [commitment] offense" to reverse a grant of parole given the inmate's "extraordinary rehabilitative efforts specifically tailored to address the circumstances that led to her criminality, her insight into her past criminal behavior, her expressions of remorse, her realistic parole plans, the support of her family, and numerous institutional reports justifying parole, as well as the favorable discretionary decisions of the Board at successive hearings." (*Id.* at p. 1226.)  In that circumstance, "the unchanging factor of the gravity of petitioner's commitment offense has no predictive value regarding her *current* threat to public safety, and thus provides no support for the Governor's conclusion that petitioner is unsuitable for parole at the present time." (*Ibid.*)

Van Houten has shown extraordinary rehabilitative efforts, insight, remorse, realistic parole plans, support from family and friends, favorable institutional reports, and, at the time of the Governor's decision, had received four successive grants of parole. Although the Governor states Van Houten's historical factors "remain salient," he identifies nothing in the record indicating Van Houten has not successfully addressed those factors through many years of therapy, substance abuse programming, and other efforts.  The CRA evaluator, although acknowledging the historical factors, nonetheless concluded Van Houten presented a low risk for recidivism.  As in *Lawrence*, under these circumstances Van Houten's unchanging historical risk factors do not provide some evidence that she is currently dangerous and unsuitable for parole.

51

### 2. *Additional reasons proffered by the Attorney General, the trial court, and the dissent are not supported by the record*

The Attorney General, in his return to Van Houten's petition, the trial court, in its decision denying Van Houten's habeas petition, and our dissenting colleague offer additional bases, not specifically cited in the Governor's decision, to support the reversal of Van Houten's parole. We reject these additional bases.

The Attorney General quotes *Rosenkrantz*, *supra*, 29 Cal.4th at p. 682, for the proposition that " 'The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole.' " The Supreme Court later held in *Lawrence*, however, that "the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or postincarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative of the statutory determination of a continuing threat to public safety." (*Supra*, 44 Cal.4th at p. 1214; see *In re Swanigan* (2015) 240 Cal.App.4th 1, 16 [rejecting parole denial based on circumstances of commitment offense when Board failed to link those circumstances to a risk of current dangerousness].) As discussed, in *Lawrence*, the court concluded the circumstances of the inmate's commitment offense was no longer predictive of her risk of recidivism, given her stellar postconviction record. (*Lawrence*, at p. 1226.) *Lawrence* compels the same conclusion here.

The Attorney General argues that Van Houten is inconsistent in her statements as to whether she willingly participated in the murders or was "in a sort of unconscious state due to obligation and indoctrination." The Attorney General contrasts Van Houten's statements about taking part in the murders to prove her devotion to Manson and the cult, and statements that she " 'felt obligated to participate.' " The Attorney General also notes Van Houten's statement in describing her actions during the murders that " 'none of this was conscious.' "

We disagree with the Attorney General's characterization of the record, which takes Van Houten's statements out of context. Van Houten never denied, either in her CRA interview or at her parole hearing, that she was anything less than a willing participant in the murders. Certainly Manson's indoctrination led her to believe in his divinity and the rightness of his cause, but she did not claim she was not acting of her own free will. The full quotation referenced by the Attorney General reads, "I believed in Manson. I believed in his belief system, I felt obligated to participate. I wanted to participate. I believed that it was something that had to be done." This cannot be read as Van Houten suggesting she was "obligated" through some unconscious urge, when in the very next sentence she emphasized that she "wanted to participate."

As for Van Houten's statement in describing the murders that "none of this was conscious," this specifically related to her actions during the murders themselves, not her willingness to participate in the murders. Van Houten made the statement to the CRA evaluator after describing how she held Mrs. La Bianca down while Krenwinkel stabbed her. Van Houten stated, " 'I

53

went to hold her down and she began to hear Mr. La Bianca dying. She yelled out for her husband. I was trying to hold her down and Pat went to stab her and hit the collar bone and it [the knife] bent. And I ran to the door of the bedroom, said, "We can't do it. We can't kill her." [Charles Tex Watson] came into the bedroom, Pat went into the living room, I stood at the doorway, none of this was conscious, I was running on fear. Tex had stabbed her. I assumed she was dead. That's been an issue of controversy for Board hearings. She could have been alive, but I assumed she was dead, Tex said, "Do something," and handed me a knife. So, I stabbed her in the lower torso 16 times."

The above context makes clear that Van Houten was not suggesting she did not consciously participate in the murders—such an interpretation is inconsistent with her many other statements indicating her desire and willingness to participate. Rather, Van Houten was describing the chaos that ensued once the murders began, and how she took certain actions without thinking. She emphasized to the Board, however, that throughout the killings she remained conscious of her desire to please Manson, stating, "I became very critical of myself [during the killings] because I felt that I wasn't carrying my weight," by which she meant she was not doing enough to "mutilate" and kill the La Biancas as Manson had directed.

The trial court read the Governor's decision to fault Van Houten for minimizing her role in the La Bianca murders. The trial court referenced Van Houten's statement that Krenwinkel, not Van Houten, initially stabbed Mrs. La Bianca, and also Van Houten's statement that she believed Mrs. La Bianca already was dead when she stabbed her.

We will accept arguendo the trial court's reading of the Governor's decision. Even so, we fail to see how Van Houten admitting she held Mrs. La Bianca down so Krenwinkel could stab her minimizes Van Houten's role in the murder. Van Houten's statement that she believed Mrs. La Bianca was dead before Van Houten herself stabbed her cannot, in context, be read as an attempt to minimize Van Houten's culpability, when, as previously discussed, Van Houten admitted that during the murders she felt frustration that she wasn't doing *more* to contribute to the crimes. Further, as discussed, Van Houten's repeatedly admitted that she willingly engaged in the commitment offenses, spurred on by her belief in Manson's ideology and her desire to please him. Again, we fail to see how this could be read as an attempt to minimize her culpability.

Referring to Van Houten's statements in the CRA regarding her brief marriage following her third trial in 1978, our dissenting colleague contends there is a modicum of evidence that Van Houten continues to lack insight into her life offenses because she "failed to identify parallels between her relationship with Manson . . . and her marriage years later to another man seeking to exploit her." (Dis. opn., *post*, p. 7.) Acknowledging no one at the parole hearing actually asked Van Houten to discuss that marriage or whether it had similarities to her relationship to Manson, the dissent nonetheless argues Van Houten should have "independently identif[ied] the possibility that similar tendencies were at play when she married a man who, like Manson, sought to exploit her." (*Id.* at p. 8.)

We are unwilling to hold against a parole candidate a failure independently to raise an issue from decades earlier that no one—not the parole board, the district attorney, nor the

Governor—inquired about or discussed. To do so is fundamentally unfair, and imposes obstacles a parole candidate cannot reasonably be expected to overcome.

Also, the fact that no one has raised the issue of Van Houten's marriage decades ago in any recent parole proceeding means that the record has virtually no information regarding that marriage that would allow us to compare it to Van Houten's relationship with Manson. The record before us reveals nothing about Van Houten's interactions or communications with her ex-husband, how much time they spent together, or the circumstances of their divorce. We therefore cannot assume, as does the dissent, that the marriage had "parallels" to Van Houten's relationship with Manson. (See dis. opn., *post*, p. 7.)

Even if, arguendo, there were such parallels, we reject the dissent's assumption that, because Van Houten did not raise the issue of her marriage in her most recent parole proceeding, she therefore has never acknowledged those parallels. Since her divorce, Van Houten has had decades of rehabilitative programming, therapy, psychological evaluations, risk assessments, and parole hearings. The record before us covers only the most recent few years of that history. To assume an issue not raised in the recent record has never been addressed in the previous decades is speculation and not "some" evidence.

We respectfully disagree with the dissent's contention that the record before us is not sufficiently different from the record in Van Houten's 2019 habeas corpus petition, which a majority of

56

the panel denied in an unpublished opinion,[11] to support a different result. Any ambiguity the majority identified in the 2019 record regarding Van Houten's sense of personal responsibility and remorse for her crimes is absent from the record now before us.[12] As discussed above, Van Houten made clear in her 2020 parole hearing that she was a willing, enthusiastic participant in the murders, and she described in detail her remorse and the impact of her crimes on the victims' family members and the nation as a whole.

## C.    We Do Not Reach Van Houten's Remaining Arguments

Van Houten raises a number of arguments in addition to challenging the evidentiary basis of the Governor's decision, including that the Governor violated her due process rights by reversing her parole without allowing Van Houten personally to appear before him; the Governor failed to give great weight to Van Houten's status as a youthful offender; Van Houten's continued incarceration constitutes cruel and unusual punishment under the United States and California Constitutions; Van Houten was wrongly denied access to exculpatory evidence, namely audio recordings of interviews with Charles Tex Watson; and the Governor's power to reverse parole violates constitutional principles of equal protection "by creating a different parole standard for inmates whose murder convictions arise from celebrated or notorious crimes."

---

[11] *In re Van Houten* (Sept. 20, 2019, B291024) [nonpub. opn.].

[12] In her dissent to our 2019 opinion, Justice Chaney read the record to require Van Houten's release then.

57

Because we grant Van Houten's petition for lack of some evidence in support of the Governor's decision, we decline to reach these alternative arguments, on which we express no opinion.

## DISPOSITION

The petition for writ of habeas corpus is granted. The Governor's decision reversing the Board of Parole Hearings' July 2020 decision finding Leslie Van Houten suitable for parole is vacated, the grant of parole is reinstated, and the Board of Parole Hearings is directed to conduct its usual proceedings for a release on parole. (See *In re Lira* (2014) 58 Cal.4th 573, 582.)

<u>CERTIFIED FOR PUBLICATION.</u>

BENDIX, J.

I concur:

CHANEY, J.

ROTHSCHILD, P. J., Dissenting.

I disagree with the majority because, in my view, the record contains some evidence to support the Governor's decision to reverse Leslie Van Houten's 2020 grant of parole in at least two ways.  First, the current record and the record before this court in 2019 are not so materially different as to warrant our reaching a different result today than we did in considering Van Houten's 2019 petition.  The current record supports the Governor's reversal for the same reasons the record in 2019 supported the Governor's reversal:  Some evidence indicates Van Houten still "minimize[s] her role in the murder[s] of [Rosemary and Leno] La Bianca[ ], thus indicating a lack of insight into her crimes." (*In re Van Houten* (Sept. 20, 2019, B291024) [nonpub. opn.].)  Second, the record contains some evidence that Van Houten has failed to show sufficient insight by failing to make a connection between her relationship with Charles Manson and her prison marriage to a man who sought to take advantage of her. Van Houten's lack of insight into the commitment offense in these two ways "indicates that the implications regarding [her] dangerousness that derive from . . . her commission of the commitment offense remain probative of the statutory determination of a continuing threat to public safety."  (*In re Lawrence* (2008) 44 Cal.4th 1181, 1214 (*Lawrence*).)  This, when combined with "the aggravated circumstances of the commitment offense . . . provide[s] some evidence of current dangerousness to the public."  (*Ibid.*, italics omitted; see *ibid.* [permitting court to rely on aggravated circumstances of offense as a basis for denying parole if "the record also establishes that something in the prisoner's pre- or postincarceration history, or his or her

current demeanor and mental state" connects the circumstances of that crime with current dangerousness].)  Accordingly, and as I explain in further detail below, I dissent.

In 2019, this court concluded that Van Houten had failed to take sufficient responsibility for participation in the commitment offenses, because she stated that she accepted responsibility for committing her crimes, notwithstanding that her description of how she came to commit them focused on Manson having manipulated her, i.e., she blamed Manson more than she blamed herself.  As evidence supporting this conclusion, we cited her 2017 parole hearing testimony, which we concluded could be understood as her "qualify[ing] the responsibility she feels for the crimes by emphasizing Manson's role." (*In re Van Houten*, *supra*, B291024.)  And we noted that, at the 2017 hearing, " 'Van Houten explained that she "desperately wanted to be what [Manson] envisioned us being."  She admitted that following the Tate murders, she wanted to participate in the La Bianca murders because she "wanted to go and commit to the cause, too."  Van Houten told the [parole b]oard she committed the crimes in order to "prove my dedication to the revolution and what I knew would need to be done to, um, have proved myself to Manson." ' " (*Ibid*.)

We recognized in our 2019 decision, however, that Van Houten had also made statements during the 2017 parole hearing that "show[ed] some willingness to accept responsibility" both for her crimes and for Manson's ability to manipulate her. (*In re Van Houten*, *supra*, B291024.)  For example, we recognized that she had stated in her 2017 testimony:  " 'I take responsibility for the entire crime.  I take responsibility going back to Manson being able to do what he did to all of us.  I allowed it.'  Then,

2

'I take responsibility for Mrs. La Bianca, Mr. La Bianca.'"
(*Ibid*.) Nevertheless, we viewed it as "[s]ignificant[ ]" that,
"when the district attorney later requested clarification whether
Van Houten was taking responsibility for her actions, or only
for allowing Manson to influence how she conducted her life,
Van Houten replied, 'I take responsibility that I allowed myself
to follow him, and in that, I take responsibility for the actions
that I did by allowing him to influence me in the manner
that he did . . . [¶] . . . [¶] . . . without minimizing my—my,
uh, involvement.'" (*Ibid*.) Based on these types of statements,
we concluded Van Houten was "[unable] . . . to discuss that
responsibility [for the murders she committed] except through
the lens of Manson's influence" and that this "reasonably could
suggest to the Governor that Van Houten has not accepted
full moral culpability for her actions, that is, that she considers
herself less blameworthy because she committed her crimes at
Manson's behest" and viewed herself as more of a victim than
a perpetrator. (*Ibid*.) "This in turn create[d] concern that
Van Houten presents a current danger, because in emphasizing
Manson's influence, she minimizes the fact that she chose,
indeed enthusiastically, to murder the La Biancas." (*Ibid*.)

At the 2020 parole hearing at issue in the instant petition,
Van Houten's testimony likewise contains both types of
statements. On the one hand, she stated—as she did in 2017—
that she accepts responsibility for participating in the La Bianca
murders and that she wanted to participate in them. On
the other hand, she focused heavily—as she did in 2017—on
Manson's manipulation of her and how such manipulation and
a desire to be accepted by Manson led her to commit murder
on his command. Often, these two types of statements are

3

combined into a single answer.  For example, when asked why she continued to follow Manson after his plans started "moving towards violence," Van Houten indicated:  "I believed in Manson. I believed in his belief system[;] I felt obligated to participate [in the murders].  I wanted to participate.  I believed that it was something that had to be done."  When asked to discuss the causative factors leading to the murders, she described being "at an all-time bottom low."  She stated:  "[T]he things that made me weak and lost were ultimately used as manipulations against me in my conversations with Manson and how [he] chose to relate to me."  "I allowed myself to make the group more important than my early teachings of right and wrong."  Also in the context of describing the causative factors leading to the murder, she described her relationship with Manson as one "where one participant needs to be in control and the other person needs to have someone take control."  In this context, she stated:  "I didn't know what I was doing[;] I didn't know where I was going."  She further said that, because she viewed Manson as "Christ-come back, I was obligated [to do what he said].  Because I was close to him, I was obligated to see through what he knew had to happen."

The majority concludes that such statements from the 2020 hearing "cannot be read as Van Houten suggesting she was 'obligated' through some unconscious urge," because in them she also "emphasize[s] that she 'wanted to participate [in the murders].' "  (Maj. opn. *ante*, at p. 53.)  But at the 2017 hearing, as noted above, Van Houten likewise emphasized that she "wanted" to participate in the murders, and expressly accepted responsibility for the murders and her actions leading to them.  This is thus not a point of distinction between the 2017

4

and 2020 testimony, and not a basis for reaching a different conclusion than we did in 2019.

The majority concludes that, at the 2020 hearing, when Van Houten discussed Manson's effect on her, she was merely recognizing that "Manson's indoctrination led her to believe in his divinity and the rightness of his cause, but she did not claim she was not acting of her own free will." (Maj. opn. *ante*, at p. 53.) But one could also reasonably characterize Van Houten's 2020 description of Manson's effect on her in a different way. In 2019, we concluded that another reasonable interpretation of such testimony was that Van Houten viewed herself as less culpable due to being manipulated by Manson. Because I see no material difference between the testimony offered in 2017 and that offered in 2020 as to this issue, and given our "extremely deferential" standard of review (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 665), I continue to view the Governor as justified in rejecting the interpretation set forth by the majority today and instead adopting an interpretation we concluded in 2019 was reasonable. (See *In re Shaputis* (2011) 53 Cal.4th 192, 211 (*Shaputis*) ["[o]nly when the evidence reflecting the inmate's present risk to public safety leads to but one conclusion may a court overturn a contrary decision by . . . the Governor"].)

I do not view Van Houten's more recent parole hearing testimony regarding what she would do differently, were she somehow given that opportunity, as materially different from her testimony in response to the same question in 2017. At the 2017 parole hearing, "Van Houten replied that she would have stayed at her father's house and sought a job, the implication being that had she done so, she would not have become involved with

5

Manson.  Asked what one act by someone else she would change if she could, she said she would have her father not leave her and her mother." (*In re Van Houten, supra*, B291024.)  In our 2019 opinion, we concluded that this testimony reflected, "Van Houten, [when] asked hypothetically to rewrite the past, focused on where things went wrong for her personally rather than on the horrific acts that followed." (*Ibid.*)  We noted that "[i]t was only in her closing statement that she acknowledged the harm she caused the La Biancas when she said, 'I also want to apologize to all of those in the room and those that are not for the damage that I did and the stealing of their loved ones' li[ves] in a senseless manner.  I apologize very deeply for that.' " (*Ibid.*)

At the 2020 parole hearing, when the board asked Van Houten the same question, she likewise responded by first focusing on how she might have acted differently vis-à-vis her parents in her early years, and only later indicated she would change her behavior with respect to the murders.  Specifically, she responded:  "[I]t's a multilayered question, you know.  Early on, what I would have done is I would have been more supportive in hindsight of my mom when dad left.  I wouldn't have been blaming her and becoming rebellious.  I, I wish that I would have been more steadfast in the direction my life was going.  When I look back, I wish that, had I ended up at the ranch and meeting the people that I would have followed my intuitions that I got, when things began to change and leave.  Regarding the murders, on hindsight, I wish I could have gone to the police and talked to someone before it ever started."  When asked whether there was anything else she would change, Van Houten again focused on her lot in life as a teenager, rather than on the murders:  "I would not have started smoking marijuana.  I would not have, uh,

6

gotten so involved with [the boyfriend who got her pregnant as a teenager]. All of those things were spearheaded by my anger and rebelliousness at my mom and feeling that dad had left me."

Thus, in her 2020 response, Van Houten continued to focus primarily on changing her lot in life early on, rather than on her role in the murders. Van Houten did also mention in her 2020 response that she would have called the police before the murders took place, but I do not view this as reflecting the insight one could reasonably conclude was lacking in Van Houten's 2017 answer. In both 2017 and 2020, Van Houten indicated she would use a hypothetical ability to rewrite the past *first* to change the circumstances in her life as a teenager, rather than undo the murders she committed. In her 2020 response, she merely appended to that response that she would also take steps to prevent the murders. This response continues to suffer from the same lack of insight we identified in 2019.

I further conclude that the record contains at least a " 'modicum' " of evidence to support the Governor's reversal of parole in a manner not discussed in our 2019 opinion. (*Shaputis*, *supra*, 53 Cal.4th at p. 210.) Specifically, the record contains evidence from which one could reasonably conclude that Van Houten failed to identify parallels between her relationship with Manson—a relationship in which, according to Van Houten, Manson manipulated her and was able to do so because she was desperately seeking his acceptance—and her marriage years later to another man seeking to exploit her. The record reflects Van Houten was married "briefly" to a parolee she met in the visitors' room while in prison. She initially was not aware that this man—like Manson—"wanted to exploit [her]." Van Houten's counsel urges that, because Van Houten divorced the man after a

7

short time, the relationship actually indicates that Van Houten has learned from the past.  This is one, but certainly not the only reasonable interpretation of the evidence.  And the record does not contain anything indicating Van Houten ever made the connection that she, through this marriage, was again setting herself on a path to be manipulated by a man.  To the contrary, Van Houten downplayed the relationship when speaking to the parole board by indicating she "didn't have any relationships while in prison, but [rather] she wrote to a couple guys."[1]

Van Houten's counsel noted at the hearing before this court that Van Houten was never asked whether there were any similar tendencies at play in her prison marriage and her relationship with Manson, and suggested we therefore should not draw conclusions from her failure to identify such tendencies or other similarities between the two relationships.  But given her claim that, through her extensive therapy and programs, she has gained insight into how she came to commit heinous crimes as a way to make a man "believe . . . in [her]" and "accept[ ]" her, her failure to independently identify the possibility that similar tendencies were at play when she married a man who, like Manson, sought to exploit her, constitutes at least some evidence that her insight into the causes of her crime is lacking.

In the foregoing ways, I conclude the record contains some evidence Van Houten lacked insight into the commitment offense. Coupled with the heinous nature of that crime, this is sufficient

---

[1] Further information in the record about these relationships is sparse, but includes evidence that Van Houten corresponded for approximately 16 years with a man who murdered two women, that this relationship was romantic in nature, and that it ended because the man committed suicide.

under *Lawrence, supra,* 44 Cal.4th at p. 1214, to provide some evidence of current dangerousness and support the Governor's decision.  Accordingly, I would deny Van Houten's petition for writ of habeas corpus.



ROTHSCHILD, P. J.

9